STATE OF NEW JERSEY, ex rel. STATE BOARD OF MILK
CONTROL, complainant-respondent,

*v.*

NEWARK MILK COMPANY, a body corporate, defendant-
appellant.

[Argued February 8th, 1935.   Decided May 21st, 1935.]

506

*Mr. Samuel Kaufman* and *Mr. Merritt Lane* (*Mr. Morris M. Schnitzer,* on the brief), for the appellant.

*Mr. David T. Wilentz,* attorney-general; *Mr. Edward W. Currie,* assistant attorney-general, for the respondent.

The opinion of the court was delivered by

HEHER, J.

The challenged order denied appellant's motion to strike out the bill of complaint upon the ground that it does not disclose a cause of action, and enjoining it, until the further order of the court in the premises, "from selling or distributing milk to consumers or stores at less than the minimum prices fixed by the New Jersey milk control board for the area in which said defendant conducts its business for sale within the State of New Jersey."

An earlier restraint, awarded upon the filing of the bill, against the importation from sister states of milk "from

plants or dairies, not licensed, pursuant to the laws of the state," and from "purchasing milk from producers situated beyond the territorial limits of the State of New Jersey at prices less than paid the producers within the state * * * for sale within this state," was vacated. This was proper; for such a restraint is clearly an excess of power. It contravenes the commerce clause of the federal constitution. A state possesses no authority to regulate the price to be paid in a sister state for milk acquired there, or to prohibit the importation of milk of wholesome quality acquired in another state, whatever the price may be. A state may not, in any form or under any guise, directly impose a burden upon the prosecution of interstate business. *Baldwin* v. *G. A. F. Seelig, Inc., 55 S. Ct. 497; 79 L. Ed. 1032.*

The respondent board came into being by virtue of the provisions of chapter 169, of the laws of 1933. *P. L. 1933 p. 353.* The legislature invoked the police power to enact what it declared to be an "emergency law, necessary for the immediate preservation of the public peace, health and safety." Such pressing necessity was stated to be the result of "unfair, unjust, destructive and demoralizing practices" pursued "in the production, sale and distribution of milk for human food, which are likely to result in the undermining of health regulations and standards, the demoralization of the agricultural interests of this state engaged in the production of milk, and the creation of conditions inimical to the health of milk consumers." There was a legislative finding that "such conditions have progressed to the point that there is immediate danger not only to the public health, but also to the public peace and safety." Preamble, section 1.

To correct these public evils, the milk control board was created. It was generally empowered to supervise and regulate the milk industry, including the production, importation, transportation, manufacture, storage, distribution, delivery and sale of milk and milk products in this state, "in those matters as in the declaration of legislative policy and intent stated in this act to be necessary to control or prevent unfair, unjust, destructive and demoralizing prac-

tices which are likely to result in the undermining of health regulations and standards, the demoralization of agricultural interests in this state engaged in the production of milk." It was specifically authorized, *inter alia,* to license dealers; to adopt and enforce all necessary rules, orders and regulations; to make all needful investigations, and to conduct hearings; and to fix and determine "the price to be paid to the producer and to be charged the consumer for milk in the several municipalities or markets of this state, under varying conditions, as will best protect the supply of fresh, wholesome and sanitary milk in this state, and insure a sufficient quantity of pure and wholesome milk to the inhabitants of this state, having special regard to the health and welfare of children and be most in the public interest." Articles III, IV, V and VII, as amended by *P. L. 1933 p. 688.* It is enjoined (article VII, section 1), in the exercise of the latter power, to consider "the various grades of milk produced, the varying percentages of butter fat, plant volume, seasonal production, and other conditions affecting the cost of production, cost of transportation and marketing, and the amount necessary to yield a reasonable return to the producer and to the milk dealer."

A penalty of not less than $25 nor more than $200 is prescribed for the violation of "any of the provisions of this act and/or the orders, rules and regulations of the board as adopted from time to time." Article VII, section 1 (d). Summary jurisdiction for the collection thereof is vested in the several district courts, and in the court of common pleas of a county which does not have a district court.

By express limitation, the operation of the statute wholly ceases on July 1st, 1935.

The bill, filed on January 9th, 1934, alleged the pursuit, by groups of producers of milk, for "some months" prior thereto, of various means and methods to control production, and the sale and distribution of fluid milk, in order to secure "a better financial return to such producers;" the carrying on of "milk strikes;" the destruction and "dumping" of milk, and the prevention of delivery thereof to distributors and consumers to such an extent that the "public has been denied

a sufficient supply of good, wholesome milk." There were allegations that a resultant condition was that the producers were unable to obtain reimbursement "for the actual cost of production of good clean milk;" that "the situation in the production and distribution of milk for human consumption is such that the health and welfare of the citizens of the state * * * is (sic) threatened, and an emergency exists in the state * * * in the matter of the production, sale and distribution of milk for human food;" that to avert an "immediate danger not only to the public health but also to the public peace and safety," the statute in question was enacted; that pursuant to the authority thereby conferred, the respondent board adopted certain enumerated rules and regulations, and, on June 30th, 1933, promulgated an order prescribing certain minimum prices to be charged for fluid milk in the state, whereby appellant was required to vend milk to stores in the area which it served at the price of nine cents per quart; and that appellant, in willful violation of this order, sold milk to stores at the rate of eight cents per quart, and was a habitual violator of this and other rules, orders and regulations issued by the respondent board.

It was also averred that this body, prior to the fixation of the prices and the promulgation of the rules and regulations, conducted an investigation, and "obtained proof of the conditions existing in relation to the importation, production and consumption of milk within the state," and, "after careful consideration of the facts and proofs acquired in said investigation," concluded that the prices prescribed and the rules and regulations therein referred to were essential to "protect the supply of fresh, wholesome and sanitary milk in this state."

Irreparable injury was alleged, and the general equity jurisdiction, and that expressly conferred by chapter 420 of the laws of 1933 (P. L. 1933 p. 1139), were invoked.

Appellant submitted affidavits tending to show the following matters of fact: It is engaged in the business of purchasing, pasteurizing and selling milk, and the products thereof, to retailers in New Jersey and New York. By reason

of its ability to dispose of surplus milk not required for fluid consumption during the summer season, when production is high, through its conversion into butter, cheese and other milk products, thus affording a market to its producers during the entire year, and efficiency in management, it is enabled to undersell its competitors in the fluid consumption field; and the result of the abolition by the milk control board of the consequent price differentials was a substantial drop in business volume.

The insistence is that this constitutes a deprivation of liberty and property without due process of law. On the other hand, the state maintains that appellant undersold its competitors at the sacrifice of quality; that the "situation became progressively worse as the market prices declined;" that the low price level had made it impossible for the farmers to properly feed their herds and maintain sanitary conditions; and that the ultimate result would be a termination of the supply of wholesome milk.

Appellant asserts *in limine* a lack of jurisdiction of the subject-matter. It is said that equity possesses "no jurisdiction to enforce penal laws by injunction;" and that the statute which purports to confer jurisdiction is repugnant to article X, section 1, of the state constitution, providing that "the several courts of law and equity, except as herein otherwise provided, shall continue with the like powers and jurisdiction as if this constitution had not been adopted." It relies—in vain, however—upon the doctrine laid down in *Hedden* v. *Hand, 90 N. J. Eq. 583*. There this court dealt with a statute (*P. L. 1916 p. 315*) "declaring all buildings and places wherein or upon which acts of lewdness, assignation or prostitution are permitted or occur to be nuisances, and providing for the abatement thereof by the court of chancery;" and it was held to be an unconstitutional enactment. Mr. Justice Kalisch declared that it was not the function of equity to take "cognizance of a case of a public nuisance founded purely on moral turpitude;" and that the statute there under consideration was a legislative attempt to bestow on the court of chancery jurisdiction to grant an injunction

for the abatement of a public nuisance of a "purely criminal nature," in violation of article VI, section 1, and article X, section 1, of the state constitution, relating to the exercise of judicial power, and article I, section 9, providing that no person shall be held to answer a criminal offense "unless on the presentment or indictment of a grand jury." He pointed out that "an indictment for public nuisance is cognizable" in the supreme court; and that the statute there in question "deprives the supreme court of its inherent right to pass on the question whether the facts proven constitute a public nuisance, and, if so, should be abated," and it was therefore a legislative attempt to "abstract from and to shear the supreme court of a common law power and prerogative right vested in it by the constitution;" and that, inasmuch as "the maintenance of disorderly houses was a crime at common law and was punishable and abatable in the courts of criminal jurisdiction only, * * * the effect of making such a crime punishable and abatable in the court of chancery is to deprive a defendant of his constitutional right to have an indictment preferred against him by a grand jury of the county in which such nuisance is alleged to exist, and a trial by jury."

It was noted, too, that the authority to abate a public nuisance, at the common law, resided solely in courts of criminal jurisdiction, and that this remedy was adequate. Where the nuisance is stated in the indictment to be continuing, and does in fact exist at the time of the judgment, the defendant may be commanded by the judgment to remove it at his own costs. See *State* v. *Morris and Essex Railroad Co., 23 N. J. Law 360.*

This principle should not be extended beyond its sound constitutional basis. The power here exercised is inherent in courts of equity. Equitable jurisdiction has always been exercised to restrain threatened nuisances dangerous to the health of the whole community; its exercise antedates our constitution. In *Hedden* v. *Hand, supra,* Mr. Justice Kalisch, quoting from *State* v. *Uhrig, 14 Mo. App. 413,* sets forth the grounds for equitable interposition in cases of public nuisances: "First, to restrain purprestures of public highways

or navigation; second, to restrain threatened nuisances dangerous to the health of the whole community; third, to restrain *ultra vires* acts of corporations injurious to public right; and that the exercise of equity jurisdiction in these three classes of cases is an exception to the rule * * * that a court of equity has no jurisdiction in matters of crime." In *Hutchinson* v. *Board of Health of the City of Trenton, 39 N. J. Eq. 569,* this court sustained a decree enjoining the discharge into a water course, through a pipe, of filth and offensive matter from a hotel. Mr. Justice Magie found that "the discharge complained of was a public nuisance, hazardous to the public health," and laid down the rule that, "when the ground on which a nuisance is attacked is the injury to the public, the ordinary and proper remedy is doubtless by bill or information on the part of the attorney-general." See, also, *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 27 N. J. Eq. 1.* The right of the local board of health to invoke the injunctive process in such cases was expressly conferred by the statute; and it was therefore sustained.

Moreover, the milk business, as will be hereafter pointed out, is affected with a public interest; and it is the settled rule in this state that equity may intervene to restrain a course of conduct, in respect of a business of this character, which tends to affect the public interest injuriously. Compare *Attorney-General* v. *Firemen's Insurance Co., 74 N. J. Eq. 372; Cameron* v. *International Alliance, 118 N. J. Eq. 11.* In *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 27 N. J. Eq. 631,* this court, in an opinion by Mr. Justice Dixon, said: "In equity as in the law court the attorney-general has the right in cases where the property of the sovereign or the interests of the public are directly concerned, to institute suit, by what may be called civil information, for their protection." Where the property rights of many citizens are involved, it is proper for the government upon their behalf to invoke the powers of equity. *Pom. Rem.* § *480. A fortiori,* the injunctive power may be invoked when the health or very existence of the people is menaced

by the deprivation of an essential food commodity, or its service in a contaminated state.

By the same token, and for a further reason, conclusive in itself, the attack upon the statute expressly conferring equitable jurisdiction to restrain habitual violations of the regulatory act also fails. The insistence is that this enactment "extends jurisdiction to a class of cases to which the remedy by injunction is peculiarly inappropriate." The point seems to be that the jurisdiction of chancery, at the time of the adoption of the constitution, did not extend to suits to enjoin obedience to criminal or penal statutes, and that, in conferring jurisdiction upon equity to "enforce penal laws by summary trial for contempt, and imprisonment, the statute violates the constitutional guarantee to a trial by jury in all criminal prosecutions." But this is obviously not the case. The statute confers jurisdiction to restrain habitual violations of its provisions; and authorizes the filing of a bill for the injunctive process in the name of the state, on the relation of the milk control board. It is designed to effectuate a policy deemed vital to the health and welfare of the people of the community, and penalties are prescribed to enforce its provisions. The remedy by injunction is an added means of making effective the orders promulgated to accomplish the legislative purpose. The statute invokes familiar principles of equitable jurisdiction, i. e., inadequacy of the remedy at law, irreparable injury and multiplicity of actions. If the injury is irreparable, or will occasion a multiplicity of suits, the remedy at law is inadequate. The prevention of a multiplicity of actions at law is one of the special grounds of equitable jurisdiction, and for that purpose the remedy by injunction is freely used, and that, too, although there may be a legal remedy. *32 C. J. 55.*

As observed by Mr. Justice Kalisch, in *Hedden* v. *Hand, supra:* "There is no doubt that the legislature may lawfully confer on the court of chancery the injunction power in a new class of cases to which such remedy is appropriate, or to extend the jurisdiction of the court to a class of cases which by their nature may come properly within the sphere and application of equitable principles * * *." The protection

of the public against the deprivation of an indispensable food, and its distribution in an unwholesome condition, are of paramount concern; that which so vitally affects the health and welfare of the people of the state not only justifies, but commands, adequate legislative action. It is now generally conceded that healthful milk is indispensable, especially for infant life; and experience has demonstrated that, unless proper precautions are taken, it germinates bacteria, and thereby becomes an active agent of injury to the consumer. Epidemics of disease have had their origin in contaminated milk. If the mandatory injunctive process of equity is found necessary to command obedience to the orders and regulations promulgated to thus safeguard the public health and welfare, that jurisdiction may lawfully be conferred upon equity. Government would be impotent indeed if it lacked the authority to cope with problems so intimately related to the health and general welfare of its people.

While the legislature has not the competency to impair the essential nature or jurisdiction of any of the constitutional courts, an enlargement of the jurisdiction is not such an impairment, at least if it is not incongruous with the general character and nature of the court. There is no disregard of the constitutional mandate if the new jurisdiction places within the court's control a new class of cases in complete harmony with its structure. *Harris* v. *Vanderveer's Executor*, *21 N. J. Eq. 424.* In that case, Chief-Justice Beasley declared the apposite principle (at *p. 428*): "The essential qualities of all the constitutional courts are indestructible and unalterable by the legislature. But an extension of the jurisdiction of a court, such extension being in harmony with its character, and not being a usurpation on the inherent powers of any other court, is not within the constitutional prevention. Perhaps there is no constitutional court in this country, the sphere of whose operation is entirely beyond legislative extension. * * * In the judicial system of a state, few things can be imagined more obstructive of the progress of society than courts with jurisdictions absolutely fixed."

The statute, while expressly conferring jurisdiction that

was inherent in equity, was necessary to vest in the milk control board the right to call for equitable interposition to restrain habitual violations. *Hutchinson* v. *Board of Health of the City of Trenton, supra.* The challenge to the jurisdiction is therefore devoid of merit.

We come now to a consideration of the primary question of the right of the legislature to thus regulate and control the milk industry. The insistence is that "the business of dealing in milk is a private business not affected with a public interest;" and that the statute vesting in the control board the power to fix prices for the purchase and sale of milk contravenes the fourteenth amendment of the federal constitution, and sections 1 and 16 of article I of the state constitution, in that the exercise of the statutory authority in the instant case deprived appellant of its right of property and liberty of contract without due process of law. Appellant invokes the doctrine that there is no governmental power to fix prices for the sale of merchandise unless the business is "affected with a public interest;" citing *Charles Wolff Packing Co.* v. *Court of Industrial Relations of Kansas, 262 U. S. 522; 43 S. Ct. 630; 67 L. Ed. 1103; Tyson & Bros.* v. *Banton, 273 U. S. 418; 47 S. Ct. 426; 71 L. Ed. 718; New State Ice Co.* v. *Liebmann, 285 U. S. 262; 52 S. Ct. 371; 76 L. Ed. 747; Fairmount Creamery Co.* v. *Minnesota, 274 U. S. 1; 47 S. Ct. 506; 71 L. Ed. 893; Williams* v. *Standard Oil Co., 278 U. S. 235; 49 S. Ct. 115; 73 L. Ed. 287.*

But this question has lately been disposed of, adversely to appellant's contention, by the tribunal in which is reposed the ultimate power to expound the federal constitution. The federal supreme court, passing upon a statute of the State of New York in principle not unlike ours, sustained this exercise of legislative power. *Nebbia* v. *New York, 291 U. S. 502; 54 S. Ct. 505; 78 L. Ed. 940.* It was there pointed out that the production and distribution of milk is a "paramount industry of the state and largely affects the health and prosperity of its people;" that when unfair and destructive trade practices make impossible a reasonable

return for the producers' labor and investment, the inevitable result is a let-down of the precautions against contamination, and the curtailment or destruction of the dairy industry; and that the fluid milk industry is affected by "factors of instability peculiar to itself," which at times interfere with the normal operation of the economic law of supply and demand, resulting in maladjustments that demand correction to prevent serious public injury. Mr. Justice Roberts, noting that this "industry has been progressively subjected to a larger measure of control," declared it to be fundamental that, subject to constitutional restraint, the private right of property and freedom of contract must yield to the public need; and that the guarantee of due process "demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." In sustaining the statute under consideration, as a lawful exercise of the police power to control the business in the public interest, he observed that property becomes clothed with a public interest "when used in a manner to make it of public consequence, and affect the community at large;" and that, in that sense, the phrase "affected with a public interest" is the equivalent of "subject to the exercise of the police power," and therefore means no more than that "an industry, for adequate reason, is subject to control for the public good." He declared it to be a corollary of this principle that the state may regulate the prices to be charged for the products or commodities of a business subject to control, without a violation of the due process clause, when the conditions or practices in an industry make "unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself * * *." The inquiry is whether the challenged regulation is one that is, under the circumstances, subject to condemnation as arbitrary or discriminatory. "The constitution," it was pertinently observed, "does not secure to any one liberty to conduct his business in such fashion as to

inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

Appellant maintains that, even so, there is no factual similarity between this and the instant case, and points to the predication of the New York statute upon the finding of a legislative committee, following an exhaustive inquiry, of the existence of conditions constituting a serious threat to the "paramount industry of the state," and the consequent need of such a protective measure. But, as was pointed out in the case of *Nebbia* v. *New York, supra,* the legislature is primarily the judge of the necessity of the law, and every possible presumption in favor of its validity will be indulged; and "though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power." While the finding by the legislature of the existence of conditions requiring such regulation, in the exercise of the police power, is subject to judicial review, we find no basis, in the present posture of the case, for the notion that this measure is an arbitrary or capricious exercise of legislative power. The factual basis for this legislation recited in the statute itself is not challenged. It is not to be presumed that these conditions have a purely local origin, and that those found to exist in the neighboring State of New York did not extend beyond the confines of that political division.

It is suggested that this construction of the fourteenth amendment "does not bind this court as to meaning and effect of the due process clauses of our own constitution." Even so, they are employed in the same sense in our constitution; and we entertain the view that the foregoing is a sound interpretation of the like constitutional provision. The legislature is supreme in its proper sphere; the exercise of power by it is subject only to the restraints imposed by the federal and state constitutions, and those which are fundamental in the social compact. A legislative enactment

should not be set aside unless its unconstitutionality indisputably appears. If there be a permissible doubt as to the existence of the constitutional limitation invoked against the validity of an act, the courts will not declare the act to be contrary to the constitution. *Attorney-General* v. *McGuinness, 78 N. J. Law 346*. The court cannot substitute its conception of sound public policy for that entertained by the legislature, if there be no disregard of a constitutional mandate.

We have lately affirmed the doctrine that these constitutional guaranties of the right of property and individual freedom of contract must yield to the common good and general welfare. The police power extends to all the great public needs; all personal as well as property rights are held subject to this reserve element of sovereignty. Changing conditions necessarily impose a greater demand upon this reserve power for such reasonable supervision and regulation as may be essential for the common good and welfare. The economic interests of the state may justify its exercise, notwithstanding that the expedient resorted to invades the domain of property rights or of contract; generally, it may be exerted whenever necessary for the preservation of the public health, morals, comfort, order and safety. *Pine* v. *Okzewski, 112 N. J. Law 429; 170 Atl. Rep. 825; Cameron* v. *International Alliance, supra; Hourigan* v. *Township of North Bergen, 113 N. J. Law 143*. Circumstances may so change in time or so differ in space as to clothe with a public interest what at other times or in other places would be a matter of purely private concern. *Block* v. *Hirsh, 256 U. S. 135; 41 S. Ct. 458; 65 L. Ed. 865*. See, also, in support of the foregoing: *Noble State Bank* v. *Haskell, 219 U. S. 104; 31 S. Ct. 186; 55 L. Ed. 112; Manigault* v. *Springs, 199 U. S. 473; 26 S. Ct. 127; 50 L. Ed. 274; Home Building and Loan Association* v. *Blaisdell, 290 U. S. 398; 54 S. Ct. 231; 78 L. Ed. 413; Jacobson* v. *Massachusetts, 197 U. S. 11; 25 S. Ct. 358; 49 L. Ed. 643; 2 Cooley Const. Lim. (8th ed.) 1224*.

We have upheld rate regulation of public utilities; and

usury laws have long been conceded as a valid exercise of legislative power. Insurance rates and the wages of railroad employes are now conceded to be the proper subjects of regulation. *German Alliance Insurance Co.* v. *Superintendent of Insurance of Kansas, 233 U. S. 389; 34 S. Ct. 612; 58 L. Ed. 1011; Wilson* v. *New, 243 U. S. 332; 37 S. Ct. 298; 61 L. Ed. 755.* And it is settled that rents may be regulated when demanded by a public exigency. *Block* v. *Hirsh, supra; Brown Holding Co.* v. *Feldman, 256 U. S. 170; 41 S. Ct. 465; 65 L. Ed. 877.*

In the instant case, the exertion of legislative power was predicated upon a finding of immediate danger to the public health and welfare, and the consequent urgency of public supervision. And, as will be hereafter pointed out, the statute is entirely reasonable in its terms; there was no arbitrary action. The legislation is addressed to a legitimate end; and the measures taken are reasonable and appropriate to that end.

Nor does the statute delegate legislative power in violation of article IV, section 1, of the state constitution. It is urged, in this connection, that "no policies are laid down;" that "no limitations upon its powers are expressed;" that "hearings need not be held," unless the board deems such course advisable, and that "its action need not be predicated upon findings of fact;" and that on the whole the statute is not a regulation of the milk industry, but "an abdication to the milk control board of the power to regulate." These criticisms we find to be unfounded.

The legislature declared the governing principle and policy, and their effectuation, as is necessary in all such regulatory statutes, was confided to the agency created to administer the law. The law making body established the standard; and thereby it, and not the control board by its subsequent action in the exercise of the purely administrative function, laid down the law. While acting within the sphere of its authority, this agency is not exercising the legislative function. The control board is not vested with an absolute or unlimited discretion; it is restrained by the policy therein declared,

and by the means and methods provided for its execution. It is specifically enjoined to take the measures requisite for the elimination of destructive trade practices and ruinous competition; and to consider, in the fixation of prices, the grade and quality of the milk, and other conditions affecting the costs of production, transportation and marketing, and to permit of a *"reasonable return* to the producers and to the milk dealers." This the legislature explicitly declared to be the standard requisite for the preservation of this essential public industry. The plainly expressed legislative objective is the maintenance of a price level that will yield only a reasonable return for the producers' labor and investment, and thus insure an adequate supply of wholesome milk. To the administrative agency is committed the effectuation of this definitely expressed policy, soundly based in economics, to preserve this vital food industry by the maintenance of this price level. Such is the extent and limit of its authority. There is therefore no delegation of the exclusive legislative function. The statute is complete in itself. There is obviously no attempt to vest in the respondent board authority that is essential legislative. It reposes in it the administrative function only. And this was concededly within the competency of the legislature.

In respect of this contention, the statute is not in principle different from the Public Utility act (*P. L. 1911 p. 374*); and it meets in every respect the test of validity laid down by this court in dealing with a similar contention directed to that statute. Chief-Justice Gummere said: "The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact, or state of things, upon which the law makes, or intends to make, its own action depend." *West Jersey and Seashore Railroad Co.* v. *Public Utility Board, 87 N. J. Law 170.*

The legislature indubitably has power to vest a large measure of discretionary authority in the agency charged with the administration of a law, enacted in pursuance of the police power, to secure the health and safety of the people.

This authority is one of common exercise; it invokes the principle that sustains rate making laws, and the authority vested in examining and control boards created to regulate the professions, trades, businesses, and other callings, deemed by the law-making body to be the proper subjects of governmental supervision. It is only necessary that the statute establish a sufficient basic standard—a definite and certain policy and rule of action for the guidance of the agency created to administer the law. The exercise of such authority is neither legislative nor judicial in a constitutional sense. Tested by these considerations, the act in question does not offend the constitutional inhibition invoked. Compare *Interstate Commerce Commission* v. *Goodrich Transit Co., 224 U. S. 194; 32 S. Ct. 436; 56 L. Ed. 729; Red "C" Oil Manufacturing Co.* v. *Board of Agriculture, 222 U. S. 380; 32 S. Ct. 152; 56 L. Ed. 240; Panama Refining Co.* v. *Ryan, 293 U. S. 539; 55 S. Ct. 83; 79 L. Ed. 223; Buttfield* v. *Stranahan, 192 U. S. 470; 24 S. Ct. 349; 48 L. Ed. 525.*

It is now conceded that, in the determination of rates, the law-making body may prescribe a primary standard, and vest in a subordinate body the effectuation of its will so expressed. In the one case, the legislative function is exercised; in the other, the administrative. *Houston, E. and W. T. Railroad Co.* v. *United States, 234 U. S. 342; 34 S. Ct. 833; 58 L. Ed. 1341.*

And the claim that the prescription of minimum prices, "without an investigation by the control board of the milk industry and without notice to the defendant or opportunity afforded it to be heard," constituted a deprivation of constitutional rights is likewise untenable. In the absence of a specific constitutional or statutory requirement thereof, notice of proceedings before the subordinate body exercising, as here, the administrative function is not requisite to valid action by that body. Nor is a hearing required in the absence of a provision therefor in the organic or statutory law. The due process clause of the fourteenth amendment imposes no such requirement; and, for obvious reasons, the like clauses in the state constitution bear the same construction.

As pointed out, the respondent board merely exercises the administrative function to effectuate the definitely declared legislative policy. Such regulation is purely a legislative function; and, even when exercised by a subordinate body, upon which it is conferred, the notice of hearing essential in judicial proceedings is not indispensable to a valid exercise of the power. If the regulation undertaken is arbitrary or unreasonable, and, in the case of rates and charges imposed upon a business clothed with a public interest, confiscatory, relief may be had in the courts. A judicial review of administrative proceedings, on notice, satisfies the demand of the due process clauses. *Home Telephone, &c., Co.* v. *Los Angeles, 211 U. S. 265; 29 S. Ct. 50; 53 L. Ed. 176.* The principle of due process is to secure the citizen against the exercise of arbitrary power. "The omission [in a statute conferring such power upon a public utility commission] of the requirement of notice assimilates the procedure of the commission to that characterizing legislative action, and it is justified and sustained by those reasons of public policy upon which notice is dispensed with in legislation." *Randall Gas Co.* v. *Star Glass Co., 78 W. Va. 252; 88 S. E. Rep. 840.* See, also, *12 C. J. 1240, 1268, 1269, 1282; 51 C. J. 57.*

The statute here imposes no such requirement. The board may, in its discretion, hold "a public hearing * * * and invite producers, consumers, local dealers and public health officials in this state to submit such proofs as they may desire to aid the board in making its determination hereunder." The presumption arises that the order made is a reasonable and valid exercise of the authority conferred; and the burden of establishing the contrary is upon him who asserts it. *Des Moines Gas Co.* v. *Des Moines, 238 U. S. 153; 35 S. Ct. 811; 59 L. Ed. 1244; Boston, &c., Railroad Co.* v. *New York Central Railroad Co., 256 Mass. 600; 153 N. E. Rep. 19.* It is not suggested, that, assuming the validity of the statute, there was an unreasonable, arbitrary or confiscatory exercise of the authority conferred.

Lastly, it is maintained that the order under review is

erroneous for the following reasons, viz.: (a) it is an unconstitutional delegation of judicial power to an administrative agency, in violation of article III, article VI, section 1, and article X, section 1, of the state constitution, vesting the judicial authority in courts of law and equity; (b) the board's right thereto depends upon unsettled questions of law; and (c) the essential allegations of the complaint are denied.

We have disposed of the legal questions. As to the facts, violations of the orders prescribing the minimum prices were admitted, but excused on the ground that they were sanctioned by an individual member of the board. The board member did not possess authority to thus set aside a formal order of the board; and so, violations being confessed, the preliminary restraint was justified.

Appellant maintains that the order enjoins "implicit obedience of * * * all future orders of the milk control board." It would seem to be fairly susceptible of this construction. The order employs the statutory phraseology; and the board's argument indicates that there was a purposeful use of the statutory language to command obedience of all future orders. It is said, in justification, that "as the orders fixing prices are subject to change, it would be a vain decree for the court to decide each change must be followed by a new application and bill for injunction."

It is manifest that the order, as thus construed, is an excess of power. The court had before it, for consideration, only the order that was claimed to have been habitually violated; and it could not command obedience to all orders to be thereafter made, for this would require observance of unlawful as well as lawful orders. It is fundamental that the order imposing a restraint should be so clear, definite and certain in its terms that the person to whom it is directed may readily know what he is restrained from doing. A mandatory injunction should be phrased in equally specific and positive terms; there should be no vagueness or uncertainty as to the things required to be done. Those commanded should not be remitted to the pleadings and proofs, and required to interpret

them to determine the scope and extent of the injunction. Compare *Bayer* v. *Brotherhood of Painters, 108 N. J. Eq. 257.* See, also, *32 C. J. 369, 370.* But this deficiency is curable by an appropriate modification.

The order is accordingly modified, and, as so modified, affirmed; and the cause is remanded for the entry of a decree in accordance with this opinion.

CASE, J. (Dissenting in part.)

I agree that the milk industry is affected with a public interest, that a reasonable measure of control is quite within the province of the legislature or of a board delegated by the legislature with adequate and sufficiently defined authority, and that jurisdiction over the novel field of litigation so created may be vested in the court of chancery.

The milk control statute requires, in article VI, section 1, subdivision (h), that every licensee shall make reports to the board of all matters on account of which a record is required to be kept; and the bill of complaint alleges, *inter alia,* that the defendant has willfully failed and neglected to file a certain report required by official order No. 8. The prayer seeks a writ enjoining the defendant against violating the board's orders. The legality of the statutory provision, of the mentioned order and of the relief sought with respect to the order seemed to be established. Since the bill of complaint was good in at least this respect, it is unnecessary to seek further reason for the court's refusal to strike the bill. Whether the restraint *pendente lite,* which included an injunction against selling at less than the minimum price fixed by the board, is grounded in a valid order is less easy of determination. The statute gives the board power to investigate all matters relating to the production and sale of milk and to subpœna witnesses and records for the purpose of obtaining the information requisite to carrying out the provisions of the act. Further, and more specifically, the statute provides, article VII, section 1, that "the board may ascertain, determine and fix, by such investigations and proof as the emergency permits, the prices to be paid to the producer

and to be charged to the consumer * * *." This language anticipates, as it seems to me, that the price will have a foundation in some kind of proof. Indeed the bill recites that "the board did conduct an investigation and it obtained proof * * * and after careful consideration of the facts and proofs acquired in said investigation, determined and fixed the prices * * *." But there is no showing of what the investigation consisted or what the facts were; and a recital in a bill can scarcely take the place of proof in furnishing ground for the issue of an injunction. The depositions before us, so far as I can find, do not even show that there was an investigation or that there were facts or proofs adduced.

I have not been satisfied that in point of fact a record has been made, out of which a price may be deduced, or that in point of law a price may be fixed without such a record to justify it. In the face of that legal doubt a preliminary injunction should not, under our cases, issue. *Citizens Coach Co.* v. *Camden Horse Railroad Co., 29 N. J. Eq. 299;* *Kellett v. Local No. 274, &c., 114 N. J. Eq. 107.* My conclusion is that the decree below should be affirmed, in its refusal to strike but so modified as to omit the temporary restraint against selling for less than the fixed price. The whole adjudication, under the case presented, should have awaited final hearing.

I am authorized to say that Mr. Justice Parker and Judge Hetfield agree with this view.

As to holding the bill—

*For affirmance*—PARKER, CASE, HETFIELD, JJ. 3.

On preliminary restraint—

*For modification*—THE CHIEF-JUSTICE, LLOYD BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS; DEAR, WELLS, JJ. 10.

*For reversal*—PARKER, CASE, HETFIELD, JJ. 3.