STATE *v.* ARTHUR N. AUCLAIR.

Special Term at Rutland, November, 1938.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed January 3, 1939.

*J. H. Macomber* and *J. H. Macomber, Jr.*, for the respondent.

*K. Paul Fennell*, State's Attorney, for the State.

MOULTON, C. J. The information charges that the respondent "did * * * * sell and deliver milk which he then and there produced when he * * * * was not licensed as required by Section 7, of No. 99 of the Acts of 1937." The respondent has demurred, the demurrer has been overruled *pro forma,* and the cause is before us on his exceptions.

The grounds of the demurrer are (1) that the act is in conflict with sections 2, 5 and 6 of chapter 2 of the Constitution of Vermont, in that it attempts to delegate legislative powers to the milk control board, created by the act; (2) that it deprives the respondent of his property and property rights without due process of law, and denies him the equal protection of the law, in violation of section 1 of the 14th Amendment to the Constitution of the United States; and (3) that it is void under articles 7 and 9 of chapter 7 of the Constitution of Vermont, for the same reasons as those last above stated.

No. 99, Acts of 1937, is entitled "An Act to control the distribution and sale of milk, and to repeal chapter 197 of the Public Laws." Section 1 is headed "General Policy of Act," and it is therein declared "that the production and distribution of milk is an industry of the state affected with a paramount public interest, in that the health of the public, and especially of infants and children, imperatively requires an uninterrupted continuance of an abundance of pure milk; that due to certain unfair, unjust, destructive and demoralizing trade practices carried on

by those engaged in the production, sale and distribution of milk for human food, which are likely to result in the undermining of health regulations and standards, the dairy industry and the constant supply of pure milk to the inhabitants of the state are imperiled, and such conditions are a menace to the health, welfare and reasonable comfort of the inhabitants of the state. The general purpose of this act is to protect and promote the public welfare by insuring at all times an adequate supply of clean and pure milk and cream of proper quality to meet the needs of the inhabitants of this state, and to regulate the milk-marketing industry, and to control in general all milk sold or offered or exposed for sale to the inhabitants of this state, to the end that the public health shall not be menaced or jeopardized.''

Section 2 contains definitions of various terms employed in the act, among them the following: '' 'Market' means any city, town or village, or two or more of the same, designated by the board as a natural marketing area''; '' 'Distributor' means any person who produces and sells * * * * milk daily within the state for consumption, disposition or use within the state * * * *.''

Section 3 creates a milk control board of three members, and provides for their compensation.

Section 4 provides that it shall be the duty of the board to be informed at all times as to the supply, production and quality of milk in the State, ''that the public may be assured of an adequate daily production in the state of a proper quantity and quality''; and to be informed at all times as to the transportation, processing, storage and distribution of milk sold, consumed or used in the State. ''To the end that no part of the state shall lose or have impaired its reasonable requirements of milk of a proper quality, the board shall have power to supervise, regulate and control the distribution and sale of milk within the state. To the end that the public shall be safeguarded from the harm and economic loss it would sustain if the production of milk were substantially curtailed, the board shall procure the cooperation of those engaged in the industry to maintain fair and lawful practices. The authority herein conferred shall supplement and be in addition to but not in lieu of existing laws relating to transportation of milk, its inspection and testing, the powers of the state board of health and local health ordinances and regulations as now provided by law.''

Section 5 is as follows: ''Whenever the board shall determine, either upon complaint or upon its own initiative, after public notice and hearing, that the public health is menaced, jeopardized, or likely to be impaired or deteriorated by the loss or substantial lessening of the supply of milk of proper quality in a specified market, the board shall fix the just reasonable minimum or maximum price, or both, that shall be paid producers or associations of producers by distributors, and the manner of payment, and the prices charged consumers and others for milk by distributors, so long as such condition is found to prevail in such market. In fixing such prices, the board shall investigate and ascertain what are reasonable costs and charges for producing, hauling, handling, processing and any other services performed in respect to milk, and determine what prices for milk in the several localities and markets in the state, and under varying conditions, will best protect the milk industry in the state and insure a sufficient quantity of pure and wholesome milk to adults and minors in the state, and will best promote the public interest. The board shall take into consideration the balance between production and consumption of milk, the costs of production and distribution, and the purchasing power of the public, and the amount necessary to yield a reasonable return to the producer and to the milk dealer. Prices so fixed need not be uniform in all markets and may be changed from time to time after such notice and public hearing as deemed by the board in the public interest. Nothing herein shall be construed to prohibit a producers cooperative, organized under the Public Laws, from blending the proceeds from the sale of its milk in all markets and all classifications, and distributing such to its members in accordance with the contract with its members, or from making deductions from sums due members in such sums as may be authorized by the membership to be so deducted. Purchases by or sales to authorized officials of any town or city charity or public welfare department or by charitable organizations approved by such city or town officials for charitable uses shall be exempt from the price fixing provisions of this act.''

Section 6 gives the board authority to accept established classes and grades of milk, or to establish such classes and grades, and to specify to what classes or grades the prices fixed pursuant to section 5 shall apply.

Section 7 provides that "All distributors in any market designated by said board shall be licensed by said board," prescribes the fee to be paid, and gives the board authority, after hearing and notice, to suspend or revoke a license for certain specified reasons.

Section 8 requires all distributors in any market specified by the board as one in which it is in the public interest to regulate the supply, production and quality of milk to keep such records and make such reports as the board may reasonably require, and gives any member of the board or its representative the right to enter and examine all places where milk is produced, handled, distributed or sold, and examine all books and records.

Section 9 gives the board the power to make orders, hold hearings, subpoena and examine under oath producers and distributors, their books, records, etc., and "any other person deemed necessary to carry out the purposes and intent of this act"; and authorizes the board to adopt, promulgate and enforce reasonable rules and regulations.

By Section 10, the money received from fees and penalties (the latter being the subject of Section 11) is established as a special fund to be paid out by the state treasurer upon warrant of the auditor of accounts for such purposes of the act as may be approved by the chairman of the board.

Certain other sections govern the procedure before the board and an appeal to the Supreme Court and the procedure therein.

The established rule is that every presumption is to be made in favor of the constitutionality of an act of the Legislature and it will not be declared unconstitutional without clear and irrefragable proof that it infringes the paramount law. *Village of Waterbury* v. *Melendy,* 109 Vt. 441, 447, 199 Atl. 236, 239, and cases cited. It "must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States* v. *LaFranca,* 282 U. S. 568, 574, 75 L. ed. 551, 51 Sup. Ct. 278, 281; *Central Vt. Ry., Inc.* v. *Campbell,* 108 Vt. 510, 523, 192 Atl. 197, 111 A. L. R. 175; *State* v. *Clement Nat. Bank,* 84 Vt. 167, 199, 78 Atl. 944, Ann. Cas. 1912D, 22. Our investigation must proceed with these principles clearly in view.

ment to the federal Constitution and sections 7 and 9 of chapter

The claim that the act is in contravention of the 14th Amend-

1 of the Constitution of Vermont is based upon the authority to fix prices given to the board by sec. of 5 of the statute, which we have already quoted. It is argued that, since "prices * * * * need not be the same in all markets," and that producers' co-operatives and charitable organizations are exempted from its provisions, the act is discriminatory and a denial of due process, and the equal protection of law.

In *Nebbia* v. *People of the State of New York*, 291 U. S. 502, 78 L. ed. 940, 54 Sup. Ct. 505, 89 A. L. R. 1469, a statute (Laws of New York, 1933, Ch. 158), which established a board of milk control with power to fix minimum and maximum retail prices to be charged by stores to consumers for consumption off the premises where sold, was held not to violate the 14th Amendment. Speaking for the majority of the Court, Mr. Justice Roberts says (pp. 537-539, 291 U. S., pp. 516-517, 54 Sup. Ct.) : "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio* * * * *. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to say that the rule is unwise * * * *. If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so when, as here, the economic

maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with personal liberty.'' See, also, *Highland Farms Dairy* v. *Agnew,* 300 U. S. 608, 611, 81 L. ed. 835, 57 Sup. Ct. 549, 551.

The purpose of the statute before us, as declared in the first section, is, as we have seen, to protect and promote the public welfare by insuring at all times an adequate supply of clean and pure milk for the needs of the inhabitants of the State, so that the public health shall not be endangered. The legislative finding, as expressed in the same section, that certain unfair, unjust, destructive and demoralizing trade practices carried on by producers and distributors of milk and cream are likely to result in the undermining of health regulations and standards, the dairy industry and the constant supply of these commodities, thus endangering the public health, welfare and comfort, is conclusive upon us in disposing of this cause upon the demurrer, since there is nothing on the face of the statute, or from facts of which we must take judicial notice, to indicate that it is an infringement of constitutional rights. *State* v. *Haskell,* 84 Vt. 429, 435, 79 Atl. 852, 34 L. R. A. (N. S.) 286. There is, no doubt, a reasonable relationship between economic conditions and business practices on one hand, and the production and distribution of merchandise on the other, and where such conditions and practices interfere, or are likely to interfere, with an adequate supply of an essential article of food it is within the competency of the Legislature to take proper steps to provide a remedy for the situation. ''The police power extends to all great public needs; all personal as well as property rights are held subject to this reserve element of sovereignty. Changing conditions necessarily impose a greater demand upon this reserve power for such reasonable supervision and regulation as may be essential for the common good and welfare. The economic interests of the state may justify its exercise, notwithstanding that the expedient re-

sorted to invades the domain of property rights or of contract; generally, it may be exerted whenever necessary for the preservation of the public health, morals, comfort, order and safety * * * *. Circumstances may so change in time or so differ in space as to clothe with a public interest what at other times would be a matter of purely private concern." *State Board* v. *Newark Milk Co.,* 118 N. J. Eq. 504, 179 Atl. 116, 124. There is no closed class or category of businesses affected with a public interest. *Nebbia* v. *People of State of New York,* 291 U. S. 502, 78 L. ed. 940, 54 Sup. Ct. 505, 515, 89 A. L. R. 1469. That the milk industry of this State is so affected would, under the circumstances set forth in the first section of the act, be apparent even without the express legislative declaration to that effect.

Therefore the price fixing provisions are valid, unless, as stated in the Nebbia case, they are arbitrary or discriminatory, or demonstrably irrelevant to the policy of the Legislature. The statute itself negatives any idea of arbitrary action by the board in this regard, for in sec. 5 the elements of costs of production, transportation, processing, distribution and other services, the balance between production and consumption and the purchasing power of the public, which the board is required to take into consideration in fixing just and reasonable prices, are carefully enumerated. From the provisions of secs. 5 and 9, relating to a public hearing and the issuance of subpoenas, and the examination of witnesses upon oath, it is apparent that the board acts in a *quasi* judicial capacity when discharging this part of its duty. The provisions are clearly relevant to the declared purpose and policy of the act.

Neither does the provision that costs need not be uniform in all markets render the act discriminatory, for it is possible that costs, balances and purchasing power may vary to such an extent in different localities that what may be a just and reasonable price in one market may not be so in another, and thus the act, instead of causing discrimination, has in reality the opposite effect. As we have seen the act provides the standards by which the prices are to be determined. See *State* v. *Newark Milk Co.,* 118 N. J. Eq. 504, 179 Atl. 116, 125; *Opinion of the Justices,* 89 N. H. 497, 190 Atl. 713, 714.

The respondent stresses the provisions relating to producers' cooperatives and charitable organizations, and argues that these are discriminatory. Although the point is inadequately briefed, for all that is said concerning it is little more than a reiteration of the grounds stated in the demurrer, we have examined it and find it to be unavailing. The equal protection clause of the Fourteenth Amendment does not prohibit legislative classification and the imposition of statutory restraints on one class which are not imposed on another. *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 U. S. 580, 583, 79 L. ed. 1070, 55 Sup. Ct. 538, 540. The State possesses a wide discretion in exercising this phase of its police power with the qualification that the classification must not be purely arbitrary or irrational, but based upon a real and substantial difference, having a reasonable relation to the subject of the particular legislation. *Power Mfg. Co.* v. *Saunders,* 274 U. S. 490, 493, 71 L. ed. 1165, 47 Sup. Ct. 678, 679; *Whitney* v. *People of State of California,* 274 U. S. 357, 369, 71 L. ed. 1095, 47 Sup. Ct. 641, 646; *Ft. Smith Light, etc., Co.* v. *Board of Improvement, etc.,* 274 U. S. 387, 391, 71 L. ed. 1112, 47 Sup. Ct. 595, 597; *Smith* v. *Cahoon,* 283 U. S. 553, 566, 75 L. ed. 1264, 51 Sup. Ct. 582, 587; *State* v. *Haskell,* 84 Vt. 429, 437, 79 Atl. 852, 34 L. R. A. (N. S.) 286; *State* v. *Hazelton,* 78 Vt. 467, 471, 63 Atl. 305. "A particular classification is not invalidated by the Fourteenth Amendment merely because inequality actually results. Every classification of persons or things for regulation by law produces inequality in some degree; but the law is not thereby invalidated * * * * unless the inequality produced be actually and palpably unreasonable and arbitrary." *Bayside Fish Flour Co.* v. *Gentry,* 297 U. S. 422, 429, 80 L. ed. 772, 56 Sup. Ct. 513, 516. The burden of proving that a legislative classification is essentially arbitrary and rests upon no reasonable basis is upon the party who asserts it, and it will not be declared invalid "unless, viewed in the light of facts made known or generally assumed, it is of such a character as to preclude the assumption that the classification rests upon some rational basis within the knowledge or experience of the legislators. A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 U. S. 580, 584, 79 L. ed. 1070, 55

Sup. Ct. 538, 540; *Borden's Farm Products Co.* v. *Baldwin,* 293
U. S. 194, 209, 79 L. ed. 281, 55 Sup. Ct. 187, 192; *Concordia
Fire Ins. Co.* v. *People,* 292 U. S. 535, 547, 78 L. ed. 1411, 54
Sup. Ct. 830, 835. This is the same principle that has been
applied in cases involving classification for the purpose of taxa-
tion. See *Colgate* v. *Harvey,* 296 U. S. 404, 422, 423, 80 L. ed.
299, 56 Sup. Ct. 252, 256, 102 A. L. R. 54; *Hart Refineries* v.
*Harmon,* 278 U. S. 499, 509, 73 L. ed. 475, 49 Sup. Ct. 188, 189;
*Town of Hartland* v. *Damon's Est.,* 103 Vt. 519, 525, 156 Atl.
518; *Clark* v. *City of Burlington,* 101 Vt. 391, 409, 143 Atl. 677;
*State* v. *Caplan,* 100 Vt. 140, 152, 153, 135 Atl. 705.

 What has been said applies also to the claim that
the statute is repugnant to Ch. 1, sections 7 and 9, of the Con-
stitution of Vermont. The first of the above sections provides
that "government is, or ought to be, instituted for the common
benefit, protection and security of the people, nation or com-
munity, and not for the particular emolument or advantage of
any single man, family or set of men who are a part only of
that community." In cases in which a violation of this pro-
vision has been asserted, it has been repeatedly recognized that,
in the exercise of the police power of the State, a legislative
classification that is not arbitrary or irrational may be estab-
lished. *State* v. *Haskell,* 84 Vt. 429, 437, 79 Atl. 852, 34 L. R. A.
(N. S.) 286; *Drouin* v. *Boston and M. R. R. Co.,* 74 Vt. 343, 354,
52 Atl. 957; *State* v. *Cadigan,* 73 Vt. 245, 251, 50 Atl. 1079, 57
L. R. A. 666, 87 A. S. R. 714; *Town School District* v. *School
Dist.,* 72 Vt. 451, 455, 48 Atl. 697; *State* v. *Harrington,* 68 Vt.
622, 625 *et seq.,* 35 Atl. 515, 34 L. R. A. 100. And as far as the
question of classification is concerned, the equality clause of the
Fourteenth Amendment and the proportional clause of our Con-
stitution are the same in effect. *Clark* v. *City of Burlington,*
101 Vt. 391, 409, 143 Atl. 677. This is so whether the question
is one of taxation or police power.

 Tested by the foregoing principles, we cannot assume
that the classification made in the act in question is irrational
and beyond the discretionary power of the Legislature. There
is nothing in the wording of the statute, or in matter of common
knowledge, or matters of which judicial notice may be taken
that shows the existence of an arbitrary discrimination. See
*Borden's Farm Products Co.* v. *Baldwin,* 293 U. S. 194, 209,

79 L. ed. 281, 55 Sup. Ct. 187, 192. So far as producers' co-operatives (which are corporations organized for the marketing of agricultural products under chapter 241 of the Public Statutes). are concerned, the act merely leaves untouched the distribution among its members of the proceeds of the sale of its milk, in accordance with its contract with them, and making deductions with their consent, and there is nothing to imply that the price restrictions are not to be operative upon the milk sold by the associations, since they come within the definition of distributors, by sec. 2 of the act, which provides that a " 'person' means any * * * * cooperative association." As for the exemption of charitable organizations or their agents from the price fixing provisions, this is in line with the public policy of the State, as expressed in Ch. 2, section 64, of our Constitution, for their encouragement and protection.

The ground of demurrer by which it is asserted that the act is invalid as an unconstitutional delegation of legislative power presents the next question. The argument is in effect that the board of milk control are given authority to designate markets, without defining or establishing the criteria by which the determination of "natural marketing areas" may be reached, thus leaving the decision to the unguided and uncontrolled discretion of the board. Since, by section 7 of the act, the requirement of a license applies only to distributors who carry on their business within a market designated by the board, it is obvious that, if the board has no constitutional power to designate such market, the respondent cannot be convicted of the offense charged against him, and his demurrer on this ground must be sustained.

It is a fundamental principle of the American Constitutional system, clearly expressed in our own State Constitution, (Ch. 2, sec. 5) that the legislative, executive and judicial departments of government are separate from each other, and therefore such functions of the Legislature as are purely and strictly legislative cannot be delegated, but must be exercised by it alone. *Village of Waterbury* v. *Melendy,* 109 Vt. 441, 448, 199 Atl. 236, 239, and cases cited. But the doctrine of the separation of governmental departments does not mean an absolute and entire separation for "the efficient exercise of the police power inherent in the people of this State is not to be frittered away by

over-nice speculations upon the distribution of the powers of government." *Sabre* v. *Rutland R. R. Co.*, 86 Vt. 347, 362, 365, 85 Atl. 693, 700, Ann. Cas. 1915C, 1269. Since legislation must often be adapted to complex conditions involving a host of details, with which the lawmaking body cannot deal directly, the Legislature may, without abdication of its essential functions, lay down policies and establish standards "while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply." *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 421, 79 L. ed. 446, 55 Sup. Ct. 241, 248; *Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 530, 79 L. ed. 1570, 55 Sup. Ct. 837, 843, 97 A. L. R. 947; *Field* v. *Clark*, 143 U. S. 649, 36 L. ed. 294, 310, 12 Sup. Ct. 495; *Village of Waterbury* v. *Melendy, supra; In re James*, 99 Vt. 265, 274, 132 Atl. 40. An agency charged with the duty of administering a statute enacted in pursuance of the police power of the State may be vested with a wide discretion, but such discretion must not be unrestrained and arbitrary. It is essential to the validity of the statute that it shall "establish a certain basic standard—a definite and certain policy and rule of action for the guidance of the agency created to administer the law." *State* v. *Newark Milk Co.*, 118 N. J. Eq. 504, 179 Atl. 116, 125; *People* v. *Barnett*, 344 Ill. 62, 176 N. E. 108, 109, 114, 76 A. L. R. 1044; *Ferretti* v. *Jackson*, 88 N. H. 296, 188 Atl. 474, 478. Only after having fixed a primary standard may the Legislature clothe an administrative body with authority to fill up the details by prescribing reasonable rules and regulations appropriate to the accomplishment of the purpose of the act. *United States* v. *Shreveport Grain and Elevator Co.*, 287 U. S. 77, 85, 77 L. ed. 175, 53 Sup. Ct. 42, 44; *Sabre* v. *Rutland R. R. Co. supra*, 86 Vt. p. 366.

 Whether or not the standard as established is sufficiently definite to meet the constitutional requirement must depend in large measure upon the circumstances of each particular case. *Village of Waterbury* v. *Melendy*, 109 Vt. 441, 453, 199 Atl. 236, 242. The rule is thus stated in *Vallat* v. *Radium Dial Co.*, 360 Ill. 407, 196 N. E. 485, 487, 99 A. L. R. 607, 611, 612: "In order that a statute may be held valid, the duty imposed by it must be prescribed in terms definite enough to serve as a guide

to those who have the; duty imposed upon them. Such definition may be by words which have a technical or other special meaning well enough known to permit compliance therewith or words which have an established meaning at common law through decisions; but if the duty is imposed by statute through the use of words which have not yet acquired definiteness or certainty and which are so general and indefinite that they furnish no guide, the statute must be declared invalid. * * * * If the statute leaves it to a ministerial officer to define the thing to which the statute is to be applied, and if the definition is not commonly known in the modes already pointed out, the act becomes invalid because it creates an unwarranted and void delegation of legislative power.''

Milk control statutes each containing a provision giving a board or commission authority to designate a natural marketing area, or a ''milk shed'' have been enacted in other states, and their constitutionality has been passed upon by the courts in the respective jurisdictions. In some instances (see *Ferretti* v. *Jackson*, 88 N. H. 296, 188 Atl. 474; *Opinion of the Justices*, 88 N. H. 497, 190 Atl. 713; *State Board* v. *Newark Milk Co.*, 118 N. J. Eq. 504, 179 Atl. 116; *Maryland Cooperative Milk Producers* v. *Miller*, 170 Md. 81, 182 Atl. 432) the point in issue before us was not considered. Other decisions, in which the question was raised, are not especially helpful. In *Franklin* v. *State*, 232 Ala. 637, 169 So. 295, 301, the contention that the authority was an unlawful delegation of legislative power was summarily dismissed with the curt remark that it was without merit. In *Albert* v. *Milk Control Board*, 210 Ind. 283, 200 N. E. 688, 695, the constitutionality of the provision was upheld upon the authority of *Nebbia* v. *People of New York, supra*; but in the Nebbia case the question of delegation was not considered. See *Ferretti* v. *Jackson, supra*, p. 480, 188 Atl. In *Reynolds* v. *Milk Commission*, 163 Va. 957, 179 S. E. 507, 514, the entire act, including the provision concerning the designation of natural marketing areas, was sustained on the ground that the milk industry was affected with a public interest. In *Highland Farms Dairy Co.* v. *Agnew*, 16 Fed. Supp. 575, 576, 581, wherein the same Virginia statute was before the federal district court, it is said: ''We do not think that the authority given the board to determine in what areas it should exercise its powers contradicts

or nullifies the legislative finding or amounts to an improper delegation of legislative power. It is merely left to the board to ascertain whether trade practices, harmful to the public interest, are prevalent in a particular area, and, if so, to exercise the power to make rules and regulations and fix prices for the milk produced and distributed therein.'' This seems to be a holding that the preamble of the act, which was sustantially the same as sec. 1 of our Vermont statute, furnished a sufficient standard of action. On appeal to the United States Supreme Court (*Highland Farms Dairy* v. *Agnew,* 300 U. S. 608, 612, 613, 81 L. ed. 835, 839, 57 Sup. Ct. 549, 551, 552) the judgment of the district court was affirmed, the affirmance on this point being upon the ground that the decision of the Supreme Court of Virginia in the Reynolds case, *supra,* which upheld the constitutionality of the statute, was decisive and controlling since the extent of distribution of power among its governmental organs is commonly, if not always, for the state itself to decide.

We cannot agree that merely because a given industry is affected with a public interest a regulatory act is necessarily valid; nor can we assent to the proposition that the statement of the policy and purpose of an act is always sufficient to constitute a primary standard. But the limits of the delegated administrative authority may be found in the meaning of the terms used in making the delegation. See *Vallat* v. *Radium Dial Co., supra.*

Nowhere in our statute is the board of milk control directly given authority to designate natural marketing areas, but implied authority to do this is found in section 2, defining ''Market'' as ''any city, town or village, or two or more of the same, designated by the board as a natural marketing area''; in section 5, providing that when the board shall find that the public health is endangered or threatened in a specified market, it shall fix the just and reasonable minimum and maximum price for milk therein; and in section 7, providing that all distributors in any market designated by the board shall be licensed. There are, it is true, no specific directions for the guidance of the board in the ascertainment of a market, but it cannot be said that the phrase ''natural marketing area'' has no recognized meaning of which we may take judicial notice. ''Market,'' in the sense in which the word is obviously used in the statute, signifies ''the

region in which any commodity can be sold; the geographical or economic extent of commercial demand''; ''marketing,'' ''a bringing or sending to market''; ''natural,'' ''in accordance with or due to the conditions, events or circumstances of the case; in line with normal experience.'' See Webster's New Int. Dictionary. So a ''natural marketing area,'' as the term is here employed, is a tract or region within which milk is ordinarily sold in response to commercial demand. Thus what the board is authorized to designate is adequately defined, and the existence of an arbitrary discretion in making such designation is negatived. The designation of a natural marketing area is a determination of fact, upon which the exercise of the board's authority depends. The standard by which the designation is to be made is implicit in the phrase itself.

We hold that the Milk Control Act is not in this respect an improper delegation of legislative power.

The *pro forma* ruling of the trial court was without error.

*Judgment affirmed and cause remanded.*