CUMBERLAND FARMS, INC. & others *vs.* MILK CONTROL
COMMISSION & another.

Suffolk.    December 8, 1959. — April 11, 1960.

Present: SPALDING, COUNIHAN, WHITTEMORE, & CUTTER, JJ.   .

*Milk.    Moot Question.    Administrative Board.    Words,* "Consumers," "Milk dealers."

A proceeding to review a price fixing order by the milk control commission became moot where it appeared that the order had been superseded by an amendment establishing a different schedule of prices and was no longer operative.   [674–675, 681]

A substantial amendment of a price fixing order promulgated by the milk control commission under G. L. c. 94A, § 12, is invalid without approval by the milk regulation board of the commission's declaration of the existence of a state of emergency in connection with the amendment. [676–677]

A purported approval by the milk regulation board of a declaration of the existence of a state of emergency under G. L. c. 94A, § 12, was ineffective where the board's vote on the question of such approval was equally divided.   [677]

The provisions of G. L. c. 94A, § 2 (1) (2) (4), do not confer on the milk control commission an authorization to fix prices as an alternative to the authorization conferred by §§ 10–12.   [677–678]

G. L. c. 94A, § 10, does not itself authorize the milk control commission to fix prices, but merely sets standards for the fixing of prices.   [678]

The title of a statute may be considered as an aid in the construction of doubtful provisions of the statute.   [678]

Reading §§ 10, 11, 12 of G. L. c. 94A together, they comprise a price fixing system whereby § 10 sets forth standards, § 11 authorizes the fixing of prices to be paid by one wholesale dealer to another and to producers, and § 12 authorizes the fixing of wholesale and retail prices. [679]

The word "consumers" in G. L. c. 94A, § 11 (a), is limited to those persons who use milk and consume it in the sense of processing it into various secondary milk products.   [679]

In G. L. c. 94A, § 11 (a), the words "milk dealers" mean wholesale
dealers only; that subsection authorizes the milk control commission
to fix prices to be paid by wholesale dealers among themselves, but
not the prices to be paid by retailers to wholesale dealers. [680]

PETITION, filed in the Superior Court on November 18,
1958.

The case was heard by *Thompson*, J.

*James C. Gahan, Jr.*, (*Paul A. Kelley* with him,) for the
petitioners.

*Bernard N. Abrams*, Special Assistant Attorney General,
for Milk Control Commission.

*Edmund L. Twomey*, for the intervener, Whiting Milk
Company.

SPALDING, J.   This is an appeal from a decree of the
Superior Court on a petition for review of proceedings of
the milk control commission (hereinafter the commission)
which had resulted in the promulgation of official order
G17–505 establishing minimum wholesale and retail prices
for milk sold in the greater Boston area.  G. L. c. 94A, § 21.

In May of 1958, the commission received a petition under
G. L. c. 94A, § 12, signed by Guy W. Clark and others which
asked it to fix minimum prices for milk sold in milk market-
ing area 17.   On September 3, 1958, the commission gave
notice (c. 94A, §§ 10–12, 17, 19) that a public hearing would
be held on September 12, 1958, at the Arlington town hall
"for the purpose of receiving evidence in the matter of the
[Clark] petition . . . requesting that the . . . commission
establish minimum wholesale or retail prices, or both, for
milk sold in milk marketing area No. 17 . . . ."

On September 12 and 13 the hearing was held, and on
November 7 the commission unanimously voted the adop-
tion of a document entitled "Findings of Fact and Declara-
tion of Emergency."   On the same day the commission
submitted its findings and declaration to the milk regulation
board[1] (hereinafter the board) for its approval of the declara-

---

[1] See St. 1953, c. 604, § 7.

tion pursuant to § 12. Later that day the board "voted unanimously to approve the declaration that a state of emergency exist[ed] in . . . area No. 17 as declared by the . . . commission . . . ." Thereafter, official order G17–505 was promulgated by the commission, to be effective on November 21, 1958. This order set minimum retail and wholesale prices that were substantially higher than the then current prices.

Cumberland Farms, Inc., James P. Dacey and Commonwealth Dairy Stores, Inc., all of whom are engaged in the business of selling and distributing milk and who would be affected by the order, brought this petition for review in the Superior Court under § 21. Whiting Milk Company, which is also engaged in selling milk in area 17, was permitted to intervene as a party and will be referred to hereinafter as the intervener. On April 21, 1959, a final decree was entered affirming the action of the commission, and the petitioners appealed.

After the case was argued in this court, we informed counsel that, in view of certain provisions in § 12, there was a possibility that the challenged order might not now be in effect, and counsel were asked to furnish us with information, by affidavit or stipulation, bearing on this question, and to submit memoranda on whether the case was moot.[1] In compliance with this request, counsel supplied us with affidavits and memoranda of law. From undisputed information thus furnished, it appears that the original order G17–505 is no longer operative and has been superseded by a so called amendment 3 to that order. This amendment establishes a schedule of minimum wholesale and retail prices for milk substantially less than the prices contained in the original order. In view of this and of our interpretation of § 12, hereinafter discussed, we are of opinion that a consideration of the validity of the original order would be

---

[1] The provisions referred to read, in part: "Any . . . action taken by the commission shall be reviewed by the commission at least once in each year thereafter, and, if not thus reviewed, the orders issued shall terminate upon the expiration of the period of one year after the date of the issuance of such orders . . . ."

academic.   But it is apparent that there are important
questions involving the interpretation of certain provisions
of the milk control law which are likely to arise in the future
and concerning which the parties desire an opinion.[1]   Since
these questions have been argued at some length in the
briefs, we shall proceed to indicate our views.   *Wellesley
College* v. *Attorney Gen.* 313 Mass. 722, 731.   *Massachusetts
Charitable Mechanic Assn.* v. *Beede,* 320 Mass. 601, 609.
*Vautier, petitioner, ante,* 341, 344–345.

At the outset we assume, without deciding, that the Fed-
eral agricultural adjustment act (7 U. S. C. [1958] § 601 et
seq., especially § 608 [c]) has not invalidated, through pre-
emption, the sections of c. 94A with which we are concerned.
See *Nebbia* v. *New York,* 291 U. S. 502, 538; *Highland Farms
Dairy, Inc.* v. *Agnew,* 300 U. S. 608; *Ray* v. *Parker,* 15 Cal.
2d 275, 281; *State* v. *Stoddard,* 126 Conn. 623, 626–627;
*Abbotts Dairies, Inc.* v. *Armstrong,* 14 N. J. 319, 329, 330–
331; 155 A. L. R. 1403.

The questions for discussion arise out of §§ 2, 10, 11, and
12 of c. 94A.   They may be summarized as follows:  (a)  Was
G17–505, as modified by amendment 3, promulgated and
adopted in accordance with the requirements of § 12?   (b)
If not, do any other provisions of c. 94A grant to the com-
mission authority to promulgate and issue such an order,
irrespective of whether the requirements of § 12 have been
met?  We are of opinion that the answer to both questions
must be in the negative.

Section 12 empowers the commission, subject to certain
conditions, to establish minimum prices, wholesale or retail,
or both, in any particular market.   Proceedings to accom-
plish this are begun on a petition filed with the commission
signed by not less than twenty-five per cent of the producers
in a market defined in the petition.   The section provides,
in part, that the petition must allege "that the price to the
producer established under authority of this chapter or . . .

---

[1] We are informed, for example, that there are proceedings now pending in
the Superior Court for the enforcement of amendment 3 which have been
stayed pending our decision in the case at bar.

pursuant to any federal law cannot otherwise be maintained, and . . . that the maintenance of such price is necessary in order to secure a regular, continuous and adequate supply of fresh, pure milk sufficient to meet the requirements of the market named in said petition and to protect the public health therein, and . . . [the] petition . . . [must request] the commission to establish minimum prices, wholesale or retail, or both, for milk for such market . . . [I]f after making such examination and investigation as is authorized by this chapter or is necessary to ascertain the facts, and after public hearing held after due notice, the commission finds . . . [that the allegations contained in the petition are true] the commission may declare, subject to approval by the milk regulation board, that a state of emergency exists. The commission, upon . . . [such] approval . . . , is thereupon authorized to issue such orders, rules and regulations as may be necessary, including the fixing by official order of minimum wholesale or retail prices, or both, for milk sold within the market affected . . . . The commission may *in like manner* at any time alter, revise, amend or rescind the prices so fixed. Any such action taken by the commission shall be reviewed by . . . [it] at least once in each year thereafter, and, if not thus reviewed, the orders issued shall terminate . . . one year after the date of the[ir] issuance . . . , and any action may . . . at any time be . . . reviewed on the order of the governor, or on the request of the . . . board" (emphasis supplied).

The intervener contends that when a price fixing order has been validly promulgated and adopted in accordance with the requirements of § 12 the commission may amend that order without obtaining the approval of the milk regulation board as to the existence of a state of emergency. We assume, arguendo, that the original G17–505 was a valid order. But it is to be noted that the commission can amend orders only "in like manner." That phrase refers, at the very least, to the sentence which immediately precedes it, and that sentence requires the "approval by the . . . board of . . . [the] declaration of . . . [the] state of emer-

gency . . . ." The adoption of the intervener's position would lead to strange results. Thus, under this view, the commission, once it had established a price order subject to the detailed safeguards of § 12, could amend that order at any time thereafter free of those safeguards. In the absence of clear language requiring it, we decline to place such an interpretation on § 12, at least where, as here, the amendment is one of substance. Thus, although there was a declaration of a state of emergency (validly approved) in connection with the original order G17-505, before amendment 3 could be operative there had to be a new declaration, subject to the approval of the board. While it appears that the commission on June 19, 1959, pursuant to an opinion of the Attorney General, made a declaration in respect to the amendment that a state of emergency existed, it also appears that the purported approval by the board, on June 30, was by a two to two vote. If this is so, and the parties concede that it is, then the commission's declaration was of no force and effect. It could become effective only upon the approval of the board and the equally divided vote of the board was not such approval. This is unlike the situation where on appeal the decision of an equally divided court has the effect of affirming the decision of the court below. Here, until the board approved the commission's declaration by a majority vote, there was no declaration.

But both the commission and the intervener argue that the commission is authorized to fix prices under §§ 2, 10, and 11 of the milk control act. Section 2 provides, in part, that "The commission shall have the following powers and duties, in addition to any others granted to it by any other provision of this chapter . . .: (1) . . . to supervise and regulate the milk industry of the commonwealth, including the production, purchase, receipt, sale, payment and distribution of milk within the commonwealth . . . (2) To investigate and regulate, as conditions permit and the purposes of this chapter require, all matters pertaining to markets, to the production, manufacture, processing, storage, transportation, disposal, distribution and sale of milk . . .

(4) No provision of this chapter conferring a general power upon the commission shall be deemed to be impaired or qualified by the granting to the commission of any specific, power or powers."

We do not agree with the intervener that the general provisions of §§ 2 (1) and 2 (2), when read with § 2 (4), amount to an authorization for price fixing which is an alternative to the specific authorization granted under §§ 10–12. We are not disposed to construe § 2 so that it would make superfluous the detailed price fixing provisions of §§ 10–12 which were the core of the original enactment of the milk control law. St. 1934, c. 376, § 15. See *Supplee-Wills-Jones Milk Co.* v. *Duryee*, 116 N. J. L. 75, 77–78, construing language similar to that in § 2.

The contention that § 10 provides price fixing authority also lacks merit. We are of opinion that this section, when read with §§ 11 and 12, does no more than set standards to guide the commission in the fixing of prices. See *J. W. Hampton, Jr. & Co.* v. *United States*, 276 U. S. 394; *State* v. *Stoddard*, 126 Conn. 623, 629–633 (reviewing authorities in the area of the price fixing of milk). In reaching this conclusion we find support in the title of § 10, which reads: "Prices, Terms and Conditions." While the title to a statute cannot control the plain provisions of the enactment, it may aid in the construction of doubtful clauses. *Opinion of the Justices*, 309 Mass. 631, 639–640. *Charles I. Hosmer, Inc.* v. *Commonwealth*, 302 Mass. 495, 501. *Flynn* v. *Board of Registration in Optometry*, 320 Mass. 29, 31–32.

We now turn to a more difficult question. Does § 11 grant authority for wholesale and retail price fixing? That section, in part, reads: "(a) The commission, after making an examination and investigation authorized by this chapter . . . shall by its order fix the minimum prices to be paid by milk dealers to other milk dealers, and to producers and consumers for milk . . . ." Based on the presence of "consumers" in § 11 (a), the intervener argues that this section places a duty on the commission to set retail prices. A grammatical reading of this clause cannot, as the intervener

concedes, support this construction. It is to be noted that the commission shall fix prices "to be paid by milk dealers to . . . consumers." Obviously, milk dealers do not pay money to "consumers," in the normal sense of that word.[1] In order to make this section intelligible we must either read "consumers" so that it does not include the retail purchaser, or, as the intervener urges, supply language so that in effect it will read, "shall . . . fix the minimum prices to be paid by milk dealers . . . [and the minimum prices to be paid by] consumers."[2] The legislative purpose underlying the milk control act leads us to the first of these alternatives. We are of opinion that §§ 10–12 were intended to be read together and to comprise a price fixing system, § 10 setting forth standards, § 11 authorizing the fixing of prices to be paid by one dealer to another and to producers, and § 12 authorizing the fixing of wholesale and retail prices. We are aided in our conclusion that the three sections ought to be read as a unit by the fact that they were all originally enacted at the same time and as parts of the same section. St. 1934, c. 376, § 15.

In view of the above, we limit the word "consumers" to include only those persons who use milk and consume it in the sense of processing it into various secondary milk products, such as butter, cheese and ice cream. Many courts of other jurisdictions have construed "consumer" as a reference, not to the ultimate retail purchasers of particular items, but to those persons engaged in manufacturing or processing who incorporate the items in a new entity. See *Cody* v. *State Tax Commn.* 235 Ala. 47; *Craftsman Painters & Decorators, Inc.* v. *Carpenter*, 111 Colo. 1, 5–6; *Volk* v. *Tax Commr.* 142 Ohio St. 335, 336–337; *Grossman* v. *Hotel Astor*, 166 Misc. (N. Y.) 80, 83. See also *Levine* v. *State Bd. of Equalization*, 142 Cal. App. 2d 760.

Official order G17–505, as modified by amendment 3, in

---

[1] Under § 1 "consumer" is defined, unless the context requires otherwise, as "any person, other than a milk dealer, who purchases milk for consumption."

[2] As a result of the legislative revision of the act in 1941 the word "consumers" was substituted for "other persons." See 1941 House Doc. No. 2728.

addition to setting retail prices, attempts to fix wholesale prices, that is, the prices paid by retail outlets to wholesale distributors. It remains to consider the intervener's contention that § 11 authorizes the fixing of such wholesale prices. The section directs the commission to fix the prices "paid by milk dealers to other milk dealers." Standing alone, the phrase "milk dealers" might very well include grocery stores, markets, and the like. We are of opinion that the scope of the phrase must be limited by resort to the overall legislative scheme of §§ 10 through 12, discussed above. See *Frye* v. *School Comm. of Leicester*, 300 Mass. 537; *Boston* v. *Quincy Mkt. Cold Storage & Warehouse Co.* 312 Mass. 638; *Costanzo* v. *Tillinghast*, 287 U. S. 341. We conclude that the words "milk dealers," in § 11, mean wholesale dealers and not grocery stores, markets or the like. Compare *Pure Milk Prod. & Dist. Assn.* v. *Morton*, 276 Ky. 736, 738–739; *Baldwin* v. *Burdick*, 243 App. Div. (N. Y.) 250. Any doubts as to the correctness of this view are set at rest by the fact that "milk dealer" and "store" are separately defined in the act. G. L. c. 94A, § 1. Thus, § 11 authorizes the fixing of prices paid by wholesale dealers inter se, but not the prices paid by retailers to wholesale dealers.

The infirmity in the intervener's position with regard to retail and wholesale price fixing under § 11 is that, if adopted, it would render § 12 a superfluous and incongruous piece of legislation. We are not persuaded by the argument that § 12 would have significance even if retail and wholesale prices could be fixed under § 11. It is argued that § 12 was inserted to permit Massachusetts producers to compel the commission to initiate proceedings with regard to price fixing when the commission has failed to do so according to its duty under § 11. But in order for the commission to act under § 12 it must find that an emergency exists, which finding must be approved by the board, and, even if this is done, the commission has discretion whether or not to set prices. But under § 11 there is no requirement that an emergency exist; nor is there a requirement of board approval

before the commission can act. If, as the intervener contends, § 12 was inserted as a check on the commission's dereliction of duty under § 11, it is difficult to understand why § 12 contains detailed limitations on the commission's authority to act, while such limitations are absent from § 11.

It must be conceded that the matters discussed above are not free from doubt; but under a statute which is not as clear as it might be we believe that the views here indicated are more in accordance with the legislative intent than those which the commission and the intervener would have us adopt.

The decree affirming the action of the commission is reversed, not on the merits, but because the original order sought to be reviewed is no longer in effect and the case has become moot. The case is remanded to the Superior Court with directions to dismiss the petition. See *Vigoda* v. *Superintendent of Boston State Hosp.* 336 Mass. 724, 726–727.

*So ordered.*