Milk Control Board,
No. 5110.

CUMBERLAND FARMS NORTHERN, INC.

*v.*

ALFRED T. PIERCE & *a.*

Argued March 5, 1963.

Decided April 30, 1963.

490

*Burns, Bryant & Hinchey* and *E. Paul Kelly, Robert F. McNeil* (of Massachusetts) and *Alfred B. Stapleton* (of Rhode Island) (*Mr. Kelly* orally), for the plaintiff.

*William Maynard,* Attorney General and *Alexander J. Kalinski,* Assistant Attorney General (*Mr. Kalinski* orally), for the defendants.

*Booth, Wadleigh, Langdell, Starr & Peters (Mr. Peters orally),* for New Hampshire Milk Dealers Association, as *amicus curiae.*

*Tiffany & Osborne* for The Granite State Dairymen's Association *(Mr. Tiffany orally),* as *amicus curiae.*

WHEELER, J. The plaintiff is a New Hampshire corporation leasing and operating a plant at Portsmouth, New Hampshire for purposes of processing and bottling milk in gallon jugs. The Portsmouth plant was recently constructed at a cost of some $300,000. The plaintiff proposes to engage solely in selling milk in gallon and half gallon jugs on a cash and carry over-the-counter basis.

On September 25, 1962 the plaintiff filed with the Milk Control Board nine applications for distributor's licenses. Under date of October 1, 1962 it filed a second set of nine applications in substitution for the original set. The latter set differed from the first in that they did not specify any "average amount of milk sold daily" but stated that the two-dollar fee was "as per fee schedule RSA 183:9 for over-the-counter distributors."

A hearing was held by the Board upon the applications on October 26, 1962 and at the conclusion of the hearing the plaintiff was notified that additional licenses would be required for each of five outlets from which it proposed to conduct its so-called "jug operations," and that the Board should first be advised of the location of these outlets. The plaintiff's manager, Mr. Haseotes, was also advised that the Board has approved the pending applications for distributor's licenses and would act upon and approve "whatever applications for retail milk licenses his two corporations would apply for."

Under date of October 29, 1962 the Board issued to the plaintiff nine distributor's licenses "for the purpose of selling more than two quarts and not more than 20 quarts of milk daily" in each of nine different areas within the state. On November 1, 1962 the plaintiff commenced the sale of milk in gallon and half gallon containers at the established prices of 51 cents a half gallon, and $1.02 a gallon, over the counter, at five outlets in four of the nine areas for which it had been issued licenses.

These five locations were specified in four additional applications executed by the plaintiff under date of October 31, 1962 which were received by the Board together with $10 in fees on November

2, 1962. Under date of November 2, 1962 by letter to plaintiff's counsel the Board denied these applications "because they [Cumberland Farms, Inc.] are selling milk without licenses now." On November 5, 1962 the plaintiff filed in the Rockingham County Superior Court a petition for mandamus seeking to compel the issue of licenses for its five retail stores. This petition was dismissed on motion of the Board on November 7, 1962 upon the ground that the plaintiff had an adequate remedy under RSA ch. 541.

In the meantime from November 1 to November 9, 1962 the plaintiff sold milk, over the counter, at its five outlets at the prices established by the Board. On November 9, 1962 however, the plaintiff reduced its prices to 79 cents per gallon and 41 cents per half gallon. On the same day the Board notified the plaintiff that a hearing would be held on November 15, 1962 to determine why its nine distributor's licenses issued October 29, 1962 should not be revoked. This hearing was postponed to November 26, 1962. Also on November 9, 1962 criminal complaints were instituted by the Board against the plaintiff.

On November 16, 1962 the plaintiff filed with the Board a motion for rehearing with respect to the Board's order of October 31, 1962, which continued in effect its prior general orders and regulations with respect to milk prices. On November 21, 1962 the plaintiff filed with the Board a motion for rehearing with respect to the November 2, 1962 order of the Board denying the plaintiff's applications for five licenses for retail outlets.

On November 23, 1962 the plaintiff filed in the Superior Court the bill in equity now before us (No. 5124) which sought a temporary order to enjoin the Board from holding the proposed hearing of November 26, 1962 for the purpose of revoking the plaintiff's nine distributor's licenses. This relief was denied by the Superior Court and following a hearing on November 26, 1962 the Board ordered the nine distributor's licenses revoked "because of repeated violations of the law" by the plaintiff. On the same date the Board denied both of the plaintiff's pending motions for rehearing of its previous orders.

In compliance with the order of November 26, 1962, the plaintiff surrendered its nine distributor's licenses, and it has sold no milk in New Hampshire since that date.

On December 1, 1962 the plaintiff filed with the Board an application for a license "for sale of milk outside of State of New

Hampshire pursuant to RSA 183:10 and 183:11." On December 6, 1962 this application was denied by the Board, and the fee which accompanied it was returned, upon the ground that the statute "does not set up a separate license classification for distributors who distribute milk outside the State only," and that prior applications by the plaintiff had been denied "for violations of the milk control law." By letter also dated December 6, 1962, the plaintiff's counsel requested the Board to reconsider this order.

On December 14, 1962 the plaintiff filed a motion in Superior Court to amend its pending bill in equity (No. 5124) to seek an order which would vacate the revocation of its nine distributor's licenses by order of the Board on November 26, 1962, and permit the plaintiff to resume over-the-counter sales in jugs. At a conference in the Superior Court on December 17, 1962 an agreed statement of facts was proposed preparatory to transfer of the plaintiff's bill in equity to this court. On December 26, 1962 this appeal, or petition for certiorari (No. 5110) was filed in this court. On January 18, 1963, after hearing in this court, temporary relief sought during the pendency of the appeal was denied. *Cumberland Farms* v. *N. H. Milk Control Board*, 104 N. H. 364. However, on February 8, 1963, the plaintiff was authorized by order of this court, after hearing, to utilize the Portsmouth plant for the processing of milk procured and to be sold outside of New Hampshire.

Certain procedural questions will first be considered. It is contended by the Board and by *amici* that the plaintiff, by its failure to file with the Board a motion for rehearing following its order of November 26, 1962 which revoked the plaintiff's nine distributor's licenses and by its further failure to move for a rehearing of the Board's decision of December 6, 1962 denying plaintiff's application for a license to sell milk outside the state, is now precluded from questioning these orders, since the provisions of RSA 541:22 relating to appeals from orders of the Board make the statutory appeal an exclusive remedy. See RSA 183:18.

For reasons which will hereinafter appear we do not consider that these omissions are fatal to proper consideration of the major issues which are presented by this appeal.

While the plaintiff in the cases now before us questions the procedures adopted by the Board and its interpretation of the statute, its attack upon the statute upon constitutional grounds

is understood to proceed upon comparatively narrow grounds. Recognizing apparently that the right to exercise the powers granted by section 7 of the act has properly been made to depend upon preliminary findings which must satisfy specified prerequisites, yet the plaintiff contends that once such findings have been made, no suitable standards are provided by the statute to guide and control the Board in its determination of what the maximum or minimum prices to be fixed shall be.

Although the present section 6 is only incidentally involved in these proceedings the plaintiff asserts that it, as well as section 13, was held unconstitutional in *Opinion of the Justices*, 88 N. H. 497. And while the plaintiff recognizes that the present section 7 (then *s*. 6) was upheld by the same opinion, and the act in general by *Cloutier* v. *State Milk Control Board*, 92 N. H. 199, it urges that both of these opinions should be reconsidered in the light of the facts presented by the pending litigation, and that section 7 should now be held unconstitutional.

Particular emphasis is placed by the plaintiff upon more detailed provisions found in other statutes, as an indication of the shortcomings of the New Hampshire act. See *State* v. *Stoddard*, 126 Conn. 623; *State* v. *Auclair*, 110 Vt. 147. We do not consider that this comparison demonstrates any fatal defect in our own statute.

As was pointed out in *Opinion of the Justices*, 88 N. H. 497, 499, "the power of the board to establish prices is dependent upon the prevalence of an economic condition injurious to public health in a definite marketing area, and the existence of this condition in such area must first be found as a fact . . . . " Having found that the facts warrant regulations, the Board is then subject to the requirement that prices fixed by it must be "just and reasonable" (*s*. 7, *supra*), a comprehensive standard which has long been recognized and applied in this jurisdiction in the field of public utility regulation. RSA 378:7. *Grafton &c. Co.* v. *State*, 77 N. H. 539; *New England Tel. & Tel. Co.* v. *State*, 98 N. H. 211, 218. See *Gordon* v. *Public Service Co.*, 101 N. H. 372.

In our judgment, greater particularization of factors to be considered in establishment of "just and reasonable" prices such as may be found in some other milk control statutes, is not a constitutional requirement, and may in practice serve to limit rather than promote a broad consideration by the Board of all factors which in a particular case may reasonably be thought relevant in

determining prices which shall be just and reasonable from the standpoint of varied and frequently conflicting interests. In this connection it is of interest to note that the statute before the court in *State* v. *Stoddard*, 126 Conn. 623, *supra*, resembled the statute considered in *Ferretti* v. *Jackson*, 88 N. H. 296, in that it imposed no standards to be followed in fixing prices, and that the Connecticut court thought that mere consideration of certain "cost factors" which an amendment of the statute required, did not provide an adequate standard. However a still more recent amendment of the Connecticut statute enacted after the violation before that court was committed, provided for the first time that the administrator should "cause . . . prices to be just and reasonable" and specified factors to be considered in arriving at just and reasonable prices. *State* v. *Stoddard*, *supra*, 126 Conn. 623, 632. Similarly the Vermont statute, upheld by the court in *State* v. *Auclair*, 110 Vt. 147, *supra*, required the Board to fix "the just reasonable minimum or maximum price, or both." *Id.*, 155.

It seems obvious to us that in fixing prices which are "just and reasonable," the Board is bound to and does consider among other things the costs which are incurred by the distributor whose price is being regulated. See *American Can Co.* v. *Milk Control Board*, 316 Mass. 337. The fact that the statute does not expressly prescribe that the Board shall do this, in our judgment does not operate to invalidate the statute.

With respect to the present section 6 of the statute, it is true, as the plaintiff points out, the *Opinion of the Justices*, 88 N. H. 497, 498, stated that it, and what is now section 13 of the act, were invalid "[s]o far as [they] purport to confer upon the board general authority to regulate and control the milk industry." This statement indicates that the provisions of the present section 6 were not regarded as invalid for all purposes, but only to the extent that they purported to confer unlimited "general authority to regulate . . . the industry." Properly confined in practice to powers auxiliary to the price-fixing authority validly granted by *s.* 7, the provisions of *s.* 6, many of which relate to duties rather than powers are deemed not to detract from the powers validly granted by *s.* 7. See *Conway* v. *Water Resources Board*, 89 N. H. 346, 351-352. It was under the present section 6 that the regulations upheld in *Cloutier* v. *State Milk Control Board*, 92 N. H. 199, *supra*, were issued. *Id.*, 203.

Upon reconsideration we reaffirm the constitutionality of the

milk control law. *Gordon* v. *Public Service Co., supra,* 101 N. H. 372, 375; *Abbotts Dairies* v. *Armstrong,* 14 N. J. 319; *State Board of Milk Control* v. *Newark Milk Co.,* 118 N. J. Eq. 504; *United States* v. *Rock Royal Co-op.,* 307 U. S. 533, 574-576. See *Cumberland Farms Inc.* v. *Milk Control Commission,* 340 Mass. 672.

In questioning the procedures of the Board, in particular with reference to its findings of July 27, 1962 and order of October 31, 1962, the plaintiff argues that before price controls can be imposed, the Board must first find that there has been "an actual loss or substantial lessening of a supply of milk in a specified market." With this interpretation of the statute we cannot agree.

The Board entered its order of October 31, 1962, continuing in effect its prior rules, orders, and regulations following a public hearing on September 25, 1962. In making the order, it found that "the public health is menaced, jeopardized and likely to be impaired and deteriorated by the loss and a substantial lessening of a supply of milk of proper quality in each one of the areas now under control, if price controls at the producer and resale levels are removed."

Section 7 of the act authorizes the Board to change prices fixed by it "after such notice and public hearing as deemed by the board in the public interest." RSA 183:7. The findings quoted above were made following notice of a hearing on the issue to which the findings relate. The findings themselves precisely embodied the factors which the statute prescribe as prerequisite to the imposition of price controls. RSA 183:7, *supra. Opinion of the Justices,* 88 N. H. 497, *supra; Petition of Associated Grocers,* 103 N. H. 302. The statute does not contemplate that the Board shall take remedial action after "actual loss or substantial lessening of a supply" has occurred, as the plaintiff argues, but preventive action, when the specified harm is "likely," or threatened. We therefore consider that the findings made were sufficient to warrant the continuation of existing controls.

The scope of review in this court of the findings and orders of the Board is circumscribed by the provisions of RSA 541:13 which provides: "BURDEN OF PROOF. Upon the hearing the burden of proof shall be upon the party seeking to set aside any order or decision of the commission to show that the same is clearly unreasonable or unlawful, and all findings of the commission

upon all questions of fact properly before it shall be deemed to be *prima facie* lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable."

The problem therefore is not whether this court or some other tribunal would have reached a different conclusion from that reached by the Board, but whether, taking the evidence as a whole, the Board could reasonably have found as it did, the burden being upon the plaintiff to satisfy this court "by a clear preponderance of the evidence" that the orders of the Board are "unjust and unreasonable." *Plymouth Village Fire District* v. *Water Pollution Comm'n*, 103 N. H. 169.

The defendants do not question that the plaintiff's appeal from the findings and order of October 29, 1962, effective October 31, 1962 is properly before us. While they raise a question as to the findings of July 27, 1962, as to which the plaintiff filed no motion for rehearing in accordance with the statute (RSA 541:3), the findings of July 27, 1962 were "adopted and incorporated by reference" in the findings of October 29, 1962, and hence are deemed to be properly before us on the appeal from the latter findings, and the accompanying order.

The order of October 31, 1962 continued in effect "all rules, orders and regulations and all amendments thereto, previously adopted and promulgated by the Board and now in effect." The order was entered after it had been found on October 29, 1962 in substance that the public health was likely to be impaired and deteriorated by loss of a supply of proper quality milk if price controls were removed, because milk produced elsewhere would come into the state, with adverse effect upon the production of an adequate daily supply within the state. The findings of July 27, 1962 which were incorporated by reference in the findings of October 29, 1962 in effect established that close alignment with basic prices in competing out-of-state markets was necessary to the stabilization of New Hampshire markets, and that the New England Basic Price Formula for determining prices "is the most equitable procedure yet developed." Those findings also determined that "if a gallon jug operation were set up in New Hampshire the source of supply would be from out of state, unregulated markets," and that the price of a gallon jug should be established at "twice the price of the half gallon

out of the store," and the wholesale price at the announced price per quart, regardless of size of container.

The plaintiff contends that the findings were not warranted by the evidence. A review of the record of the hearings held July 10 and September 25, 1962, discloses a considerable volume of testimony from producers, processors, and distributors, as well as from physicians, and experts in the field of marketing. The fact that much of it consisted of opinions of the witnesses did not make it incompetent. A detailed review of the testimony is not thought to be necessary, but in summary it justified the conclusion that in the last several years the cost of producing a higher quality milk has spiraled upward; that price controls, both as to producers and distributors are essential in order to establish fair market practices, and as to consumers in order to guarantee an adequate supply of high grade milk; that they assure the farmer a reasonable financial return and encourage the continuance of sanitary controls; and that where price controls have been abolished market wars among the large milk distributors have resulted, with a consequent reduction in the price paid to the producer. It had before it specific evidence from an expert witness, to which it could properly give weight, that the "Board . . . has no other sound alternative" than to " 'follow the formula' and to preserve close alignment with prices in Boston and other New England Federal order markets." We think the Board could reasonably find that if price controls were removed in this state, the price paid producers would go down, as well as the quality of milk, and that the public health would thereby be likely to be menaced. There is no reason to hold that the order for the continuation of price controls constituted a violation of the Federal Constitution. *Nebbia* v. *New York*, 291 U. S. 502.

The plaintiff asserts that the Board's recognition of the significance of the New England Basic Price Formula established by Federal Market Order in Boston, Massachusetts, demonstrates that the Board is "blindly following" that formula in disregard of its own duties. We see no reason to accept this assertion. The dominant influence of prices in the central market at Boston as affected by Federal orders is beyond avoidance and one which the Board could not properly ignore. See *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110; Bowring, "Study of the History, Administration and Operation of RSA 183 Relating to Milk

Control," Univ. of N. H. Agricultural Economics Research Mimeo-graph No. 29, (Oct. 1961) *pp.* 13-19.

It is noteworthy that under milk control the price of a quart of milk delivered in this state as of August 1962 was less than in other areas. For example there was evidence that the price in Manchester was 27.5¢; Boston, Massachusetts 29-30¢; Hartford, Connecticut 30¢; New York City 31.5¢; Chicago, Illinois 29.5 — 33.5¢; Washington, D. C. 29¢. The New Hampshire farmer in 1961 received $5.39 per cwt. for milk, which was more than farmers then received in Vermont, Maine, New York, New Jersey and Pennsylvania.

Some of the evidence indicated an antipathy against the so-called gallon jug operations as a demoralizing factor to the price structure because unless the price of milk per gallon was established at a rate competitive with the price of quarts delivered at the doorstep, many dealers in the state would be unable to compete due to the cost of establishing a gallon bottling plant. The plaintiff's operations were viewed with alarm by one expert who pointed to "the hurricane warnings, or at least the storm clouds on the horizon which threaten the continued stability of New Hampshire markets," and then referred to the plaintiff's distributing plant in Portsmouth, to be supplied with "unregulated milk."

The Board in its findings of July 27, 1962 adopted a similar view, and found that New Hampshire distributors if compelled to compete with gallon prices such as prevailed in southern New England would be forced to obtain their supply from these same "unregulated markets" which would result in the loss of a market for New Hampshire producers now supplying New Hampshire distributors, which might be disastrous. The Board then set the price of a gallon jug at twice the price of a half gallon sold "out of the store."

While fair practice may be required both under the milk control law and under the Unfair Sales Act (RSA ch. 358) "no legislation may restrict, or authorize the restriction of, competition and free enterprise to the point of absolute control. *Opinion of the Justices*, 88 N. H. 497, 499. An order that a competitor may not take advantage of his methods and opportunities merely because those with whom he competes do not employ his methods or have his opportunities, is beyond the scope of regulative power." *Cloutier* v. *State Milk Control Board*, 92 N. H. 199, 205. At the same time, the Board was entitled to consider the effect in

other areas of the unregulated sale of milk in gallon jugs. See Report of Special Subcommittee of Select Committee on Small Business, 86th Congress, 2d session, House Report No. 2231 "Small Business Problems in the Dairy Industry," *pp.* 26-27, 55-56, 64-66 (1960). We are constrained to believe that the evidence of hostility toward gallon jug operations in this case persuaded the Board to establish a price sufficiently high to make it uncompetitive. The evidence revealed that with the proper equipment milk sold in gallon jugs for cash over the counter could be sold profitably at a lower price than in quarts.

It is significant that during the pendency of this litigation the Board issued an order on February 25, 1963 establishing a price order which among other things substantially reduced the price for milk sold in gallon jugs. It is common knowledge that a number of distributors are now engaged in the gallon jug operation in the state at a reduced price. Since it thus appears that the order of October 31, 1962, so far as it related to milk in jugs is no longer controlling, the issue with respect to this feature of the findings of July 27 and October 29, 1962 is considered to be moot. In other respects, the findings and order are sustained. The plaintiff's complaint that because questions were put to its general manager by the chairman of the Board, the Board acted in violation of its own rule (RSA 183:13) that there would be no cross-examination of witnesses, does not appear to us to rise to the level of reversible error. The plaintiff's appeal from the order of October 31, 1962 is dismissed.

By order dated November 2, 1962, the Board denied the plaintiff's applications for licenses for its five retail stores. Its appeal from this order is conceded to be properly before us. Consideration of the issues thus presented requires some review of the circumstances which preceded entry of the order.

We think that section 9 of the act, relating to licenses, may reasonably be construed, as it has been in practice by the Board, to require that any distributor shall have a license for each "market designated by said board" in which it proposes to conduct its business. RSA 183:9. In defining the fees for the licenses required by section 9 the statute provides that an "over-the-counter distributor" shall pay an annual fee of two dollars, without regard to the quantity of daily average sales. *Id., s.* 9. The plaintiff applied for distributor's licenses for each of nine marketing areas designated by the Board, by substitute applications which speci-

fied no daily average sales but stated that the licenses applied for were for "distributor only: over-the-counter for consumption not on premises (store)" and that the fees paid totaling $18 were "for over-the-counter distributors." In so doing the plaintiff complied with the statutory requirements (RSA 183:9) and under date of October 29, 1962 the Board issued licenses to the plaintiff upon the basis of these applications.

We are of the opinion that the Board was in error in requiring the plaintiff to thereafter file applications for additional licenses for the five retail stores which it proposed to operate in four of the nine areas in which it had been granted distributor's licenses; and that when it operated those stores in compliance with the Board's price regulations between November 1 and November 9, 1962 it did so as a licensed distributor, under valid licenses, and so far as the record discloses, in good faith.

If the form of the licenses issued by the Board was not appropriate and some different form should have been issued, the plaintiff should not have been penalized on that account. Similarly if the Board issued the licenses in advance of receipt of required information as to the location of the stores within the marketing areas in question, the plaintiff was not properly held at fault for selling milk before the information reached the Board.

The plaintiff's appeal from the order of November 2, 1962 as to which it duly moved for rehearing is sustained upon the ground that the Board exceeded its jurisdiction and authority in requiring additional licenses for the plaintiff's five retail outlets and in denying such licenses on the ground that the plaintiff was "selling milk without licenses now."

The issues relating to the order of November 26, 1962 revoking the licenses issued on October 29, 1962 are not presented by appeal, since the plaintiff failed to move for rehearing as required by the appeal statute. RSA 541:3, 22. Admittedly after November 9, 1962, the plaintiff's operations were not in compliance with the Board's price regulations, and its conduct in this respect furnished ground for revocation of its licenses by express provision of the statute. RSA 183:9. On the same day that the order of revocation was entered, the plaintiff's motions for rehearing with respect to the orders of October 31 and November 2, 1962 were denied, so that it was then in a position to prosecute appeals from those orders to this court. RSA 541:6. Pending in the Superior Court was its bill in equity questioning the validity of the milk control law and of the orders entered thereunder; and like issues

were presented in the criminal actions also pending against the plaintiff.

Within the twenty days allowed by the statute for a motion for rehearing (RSA 541:3, *supra*) the plaintiff sought immediate relief by filing in the Superior Court in its pending equity action an amendment seeking an order vacating the November 26, 1962 order of the Board. The circumstances do not require that the plaintiff be held guilty of laches as a matter of law in failing to seek relief by appeal (*cf. Cumberland Farms* v. *N. H. Milk Control Board*, 104 N. H. 364, *supra*) particularly since the appeal from the order of November 2, 1962 was to present much of the same factual background.

The order of November 26, 1962, was grounded in part upon the erroneous conception that sales made on or after November 1, 1962 were made without a license. This was an error of law, as distinguished from an erroneous determination of issues of fact correctable solely upon appeal. *Cloutier* v. *State Milk Control Board*, 92 N. H. 199, 201-203. As such, the error is open to correction in the exercise of this court's original jurisdiction on certiorari. *Id.*, 202.

Accordingly the case will be remanded to the Board for reconsideration of its order of November 26, 1962, which must depend for its validity solely upon the plaintiff's violation of price regulations. We think that justice requires that the Board reconsider this order in the light both of its erroneous action with respect to the order of November 2, 1962 as pointed out herein, and of the severity of the penalty already imposed upon the plaintiff to date, by denial for some five months of the privilege of selling milk in New Hampshire in accordance with established prices. The change in circumstances resulting from the recent order of February 25, 1963, establishing special prices for sales in jugs also calls for reconsideration of the November 26, 1962 order, since the prior denial of special prices appears to have been a factor in the plaintiff's violation of previously applicable price regulations.

There remains for consideration in this opinion the appeal from the order of December 6, 1962 denying the plaintiff's application under RSA 183:10 and 11 for a license for sale of milk outside of the state. While the plaintiff filed with the Board no document formally styled a "motion for rehearing" of this order, it did, by letter of counsel forwarded the same day, seek to have the order reconsidered by the Board. This "application" (RSA

541:6) was neither granted nor denied by the Board. RSA 541:5. Neither the Board's omission, nor the failure of the plaintiff to request a rehearing in statutory language should be taken to preclude consideration of the order upon appeal. In view of the circumstances in this case, we therefore treat the plaintiff's contentions with respect to it as properly before us.

RSA 183:10 and 11 require a distributor's license for any person "who purchases or receives within the state" over two quarts of milk for sale or distribution without the state. The license fee imposed is the fee established by section 9 of the chapter, less any fee paid to the state of sale or distribution. Such a requirement is obviously necessary if purchases within the state for export are not to be permitted to disrupt established intrastate practices. The requirement is not discriminatory, nor is it invalid as a burden upon interstate commerce. *Milk Board* v. *Eisenberg Co.*, 306 U. S. 346; see *Alaska* v. *Arctic Maid*, 366 U. S. 199, 204; *Toomer* v. *Witsell*, 334 U. S. 385. Denial of a permit to the plaintiff because of its prior violations of regulations of the Board does not appear to us to be analogous to the circumstances considered in *Hood & Sons* v. *Du Mond*, 336 U. S. 525, cited by the plaintiff.

The plaintiff's application was denied both upon the ground of its prior violations of the law, and upon the further ground that the statute "does not set up a separate license classification" for this type of operation. Both grounds were technically correct. Yet while the statute provides only for the licensing of "distributors," we see no reason to imply a requirement that an applicant for a license to sell "without the state" under RSA 183:11, must also be licensed under RSA 183:9 as a distributor who "sells . . . within the state." RSA 183:2.

The appeal from the order of December 6, 1962 is therefore remanded to the Board for reconsideration in the light of this opinion in conjunction with its reconsideration of the order of November 26, 1962. Pending such reconsideration, the order of this court entered on February 8, 1963, authorizing the plaintiff to use the Portsmouth plant for the processing of milk for out-of-state sale is continued in effect.

*Appeal sustained in part and dismissed in part; remanded.*

All concurred.